Case number 253313, Newton Partners LP et al v. Allison Data Systems Corp et al. Order arguments not to exceed 15 minutes per side. 15 minutes to be shared by the defendants. Mr. Layman, you may proceed for the appellant. And you've reserved 4 minutes for rebuttal, correct? Yes. Okay, you may proceed. May it please the Court, Jonathan Lamed, Saxena White for the Plaintiff Appellants. We believe the District Court erred here, Your Honors, because it wholly ignored key allegations, improperly made inferences in defendants' favor, and relied on unpledged facts, all of which are improper at the pleading stage where we find this case. As set forth in our complaint, defendants knew there was an ongoing active exodus of Air Miles' key top sponsors, but they hid those damning facts from investors. And they did so to make loyalty appear like a viable company and to extract three-quarters of a billion dollars from loyalty before it entered into bankruptcy. Can you help me just understand the standard that we should apply for, say, materiality or falsity? In other words, we don't require companies to take a pessimistic view of their financial outlook. We don't require them to present a glass-half-empty view. Is your point that if they present a glass-half-full or take an optimistic view, that that then raises security issues? Or is it just if they're kind of, say, the glass is overflowing and it hasn't reached that point? But these cases are very hard, right, because we have to make a judgment about – we usually allow companies some positivity in how they're presenting, their past performance, future expected performance. So how do you kind of define the line for us when it falls into fraudulent territory? So here I think it's very easy. Okay. Well, sorry, it's a bad question. In this case in particular, defendants knew that its second-largest customer was going to be leaving, and that set forth in our complaint. Well, they didn't know that they didn't know it was leaving. They had some upheaval in that relationship, but then they renegotiated their relationship, and so they had something else in place. Well, I think that – I think that, respectfully, that ignores paragraphs 52 and 80 of our complaint, which is where – and these were critical allegations, obviously, in our case. Let me go back to the first question I asked. So the easy answer is that they – you're saying if it's intentional – if they intentionally misrepresent a very important fact, right? I don't think it's that easy. I guess I just think it's hard. Taking the allegations as set forth in our complaint, if the company knew that it was on Rocky Road, let's just say, with this key sponsor, they could have made the same statements but not included that key sponsor. Well, but do they have – this goes to Judge Radler's question. What we're trying to figure out is where's the line. In other words, if someone threatens to leave, your key sponsor threatens to leave, just thinking of it from a company's perspective, if I was running the company, my attitude would be they threatened to leave, but I'm going to negotiate with them and I'm going to keep them, right? So just threatening to leave, is that enough to go across the line that they have to disclose it? And I don't know if they have to disclose it if they would have kept quiet on the issue. What they did is made the choice to include Sobey's name in particular in the registration statement. At the time, right, this is an omission. It's not like an affirmative statement. In other words, at the time, they were still part of the program, as I understand it. And you should correct me if I'm wrong, but I thought for whatever, eight months, they were still part of the program. Well, so we have two points on that. First, they were still part of the program. They were part of the program, but in a lesser way than they were before. I agree with you that they were still part of the program. I also think that they weren't financially as committed. They were paying half as much, which is another key point. But we think the point is that once they decide to use their logo, their association, they wanted to cash in on Sobey's good name. Once they did that, this court's Helwig v. Vaincore. They were still a customer. They were a customer. Actually, they were a customer, or a sponsor. That goes back to the earlier question that you were asking, Judge Riedler. In paragraph 52 and paragraph 80 of our complaint, we allege that Sobey's confirmed that it was going to exit by 2022, and it never took that back. I want to ask about that. The best allegation for you, I think, is that at the October 2021 Go or No Go meeting, people at ADS acknowledged that Sobey's had never rescinded its intent to leave the agreement by 2022. But that's not leaving the agreement, and there's still some intervening months before the exit window renegotiated in the middle of 2022 where Sobey's could have changed its mind, as Judge Sipar said, ADS and loyalty could have negotiated a better agreement and kept them. So what I'm worried about is when you have an intent or a disgruntled client, are you rendering all sorts of statements about, we have longstanding client relationships, here are our current three biggest clients. Are you rendering all of those false in a way that's going to require companies to disclose all sorts of kind of intervening negotiations? No, because Sobey's was the second biggest client, but you can't use partial, you can't disclose partial information. They didn't have to include Sobey's name. What precise statement in either the investor presentation or the registration statement was partial taking the October 21st? We maintain deep longstanding relationships with our sponsors. You don't have to include Sobey's name there. They chose to. At the time, there was still a relationship that was being maintained, correct? Well, our allegation also is that it wasn't being maintained. I know the district court and my friends on their side are going to point to the March Amendment, but we allege in our complaint that the March Amendment wasn't this huge thing that changed Sobey's mind. Instead, it was part of the scheme. Defendants knew Sobey's wanted out. They wanted to also make sure that the spinoff could happen before that became public. So they offered that sweetheart deal, that 50% discount, in order to make sure Sobey's was there just until 2022. And that was Defendant Horne, the CEO, swore in his bankruptcy declaration that when Sobey's left, it was consistent with his prior statements. One other, I think, key fact about the March Amendment is that after the March Amendment, Mr. Chestnut, we have an allegation in paragraph 91, Mr. Chestnut, who was on the spin team, he coached his employees who were dealing with the lenders and the credit agencies, he coached them not to mention that Sobey's planned on exiting in 2022. Such coaching would be unnecessary because it was after the March Amendment at that point. If the March Amendment really meant they were secure, there would be no need for such coaching. And the district court didn't even reference that allegation whatsoever in its opinion. Can I ask you a question about the statement that you just read to us, that the one you said was misleading? So you're saying Sobey's was included in the statement about the longstanding relationships that have been maintained. Are you saying they shouldn't have included them there? Yes. Okay, wouldn't that have sent a signal to the market? Like, boy, they're listing some clients, reflective or sponsors, and one that we know is a pretty significant one is not listed. That may have sent a different negative signal, right? Precisely. But it wasn't, I mean, that could have raised more alarm bells than were necessary. In other words, it was still, right? Or they could have explained what had happened, as set forth in the complaint, that Sobey's had sent notice that it wants to leave by 2022. So the statement Go ahead. Sorry to interrupt, but this is where I go right back to Judge Raehler's initial question, which is that's, I mean, there's a lot of those. Nike has all kinds of athletes that they use. The athlete may tell them, hey, I'm going to go, Michael Jordan, I'm going to go somewhere else. Do they have to disclose it, or can they renegotiate with him and work with him and try and keep him? Or Tiger Woods, they actually, he told them he was going to go somewhere else, and they renegotiated with him, right? So back in 2000, I mean, these things happen all the time, and they don't, Nike didn't come out and say, oh, Tiger's thinking of leaving us. If Tiger, and Judge, in your hypothetical, if Tiger said, I am leaving, and never takes that back, I don't think Nike But do they have to disclose it the minute he says, I am leaving, or can they attempt to convince him to stay? Because that is exactly, in 2000, right, he said, I am leaving, or 2001. And then they renegotiated and gave him $100 million to stay. They can renegotiate, but I think the context here is pretty important. This is a spinoff. It's going to be a brand new company. It's not Nike established, you know, there's a brand new company. Investors know that. Investors know this. Wait. They know they're not investing in Nike. But they also know that the statements here are therefore heightened, because, in fact, later, analysts I mean, it's almost like there's a different standard for the Nikes of the world versus the smaller companies of the world? No, my point is that in a spinoff context, when a new company is about to be spun off, and you're telling investors that this is a stable company, don't worry about it, in that situation I didn't quite say that. But the point is that we have deep, long-standing relationships, that there's stability with our sponsors, and that analysts themselves cite Sobeys and Safeway, Sobeys' affiliate, as a reason for stability in the company. That's where it crosses the line into being misleading. With just the particulars of the renegotiated agreement, number one, were the 50% cut in fees just for 2021 fees, or did that carry forward through the end of 2023? I don't know the answer, Your Honor. I believe it's just the 2021 fee, but, again, they told them they were leaving in 2022. As to that, how does the exit window work? Is there a window within which you must give notice to terminate? Can you explain to me how that works? Precisely. There was a notice where you have to give notice to terminate. Within a certain time, or could you give it before? You're supposed to give it within a certain time, and then... To judge the par's point, and Judge Riddler's point, saying, I'm going to leave in 2022, in October of 2021, say, before the formal exit window, still leaves you some number of months in which to change your mind as a company, in which to renegotiate with Sobeys, and before which you can actually render legally significant intent to terminate. So doesn't that matter for purposes of whether the statement was... Yeah, and to answer... Can I answer your question? I see I'm out of time. At the time, in 2020, in 2021, when they said that they wanted to leave, there was no 2022 exit available. The only way they got that 2022 exit available was because they confirmed that they were going to leave to avoid the 2021 exit. They were provided what they wanted was a 2022 exit. So because the 2022 exit wasn't available at the time, I think that supports our allegations that Sobeys said we wanted out, and Air Miles did what it could to keep it on, just so it could accomplish the spinoff. Any further questions? Thank you very much. May it please the Court. Charles Duggan, Davis Polk and Woodwell for the Foreign Lines Data Systems and Mr. Andretta. Your Honor, I'd like to start talking about the amendment because I think it actually sheds some light on Sobeys' state of mind as of the spring of 2021 in March when the amendment was amended. In October of the prior year, it had communicated that it was considering either renegotiating or terminating, and both of those options were on the table. The revised terms included a new right of termination, as was just being discussed, because the termination window under the contract at that time prior to amendment, Sobeys had to elect as of the end of the first quarter of 2021, or it would be locked in the contract for the remaining term of the contract of 2024. When it renegotiated the agreement, it renegotiated a right in 2022 to revisit its desire to continue under the contract. And if it had known that it was going to exercise its right to terminate, it could have simply elected to terminate by renegotiating an end date of the contract in 2022. Instead, it renegotiated a term where the contract ended in 2023, which would only have significance if it knew that it was possible that it would not exercise its early termination right and therefore be valuable to have that last year of the contract and a shorter term of contract, because if they decided they were uncomfortable. Why didn't you have a duty to reveal the renegotiated contract and that the departure of some of your top sponsors? I mean... Well, Your Honor, the departure of some of the top sponsors was public knowledge. There were several sponsors that had left. Well, it was public knowledge they left. It wasn't public knowledge that they were top necessarily, was it? No, it wasn't public knowledge that they were necessarily top, but there's also... Was it Tiger Woods or was it... I don't know. Pick some other golfer who's not Tiger Woods. So we don't... I mean, it's hard to maybe assess the significance or materiality of them leaving? Well, it was known that they had left and the significance of it would be reflected in the revenues that was earned by the business, which was... My concern is you're making these statements, you're talking about long-standing relationships, you're talking about your largest clients, and some of them are leaving and you're not disclosing it. Again, Your Honor, it was known that these other entities had left. But Judge Raebler just pointed out, you don't know they're the top ones and you all are saying things like our top ten clients represent 55% and we have these deep, long-standing relationships with great brands, including Shell, Sobeys, Bank of Montreal, et cetera. So you're making these statements knowing that your business is in turmoil, which is causing not fully disclosing to investors. Well, as of the time the statements are made about our top ten clients, they're not referring to ones that had already terminated. They're referring to the balance of the list and the top ten clients and the degree of the revenues that they are accountable for. That doesn't cover the could statements, though, which seems to me to tee up something that was raised in the Facebook case and then not resolved by the Supreme Court. But when you say we have ten largest clients, they represent half our revenues, the loss of any of these clients could cause a significant reduction in our combined revenue. Three of them had already left. So isn't it the case that by using this could forward-looking language, you are implying something that is materially false, which is the loss of any of these clients has not yet occurred? Well, Your Honor, clients do come and go all the time. And, again, this is not... There was no mystery to the fact that some people were leaving, were exiting... Right, but... And there was... Judge, let me ask you a specific question, which is, is the could misleading in that circumstance where you already know some have left and you're saying they could cause? Your Honor, it's a cautionary warning statement as to what will be happening in the future, that some of the current clients, some of our top ten clients who generate... who account for this amount of our revenue, you should be forewarned they could leave. But what if some of them had left and you make that statement? Well, it would be former clients of ours who were important to our accounts have left the business. So how do you know... I mean, how do you know whether they're included in the ten or not? You say our ten largest clients represented, give a number, of our combined revenue for the years ended 2020 and 2019. So the two have left. How do you know whether they're included in that top ten or not? Because it's a retrospective number. We just assumed that you would only be listing at that moment the current top ten and what they meant historically, or was it what the top ten were historically? Do you understand the difference? I think it would be the top ten as of the period for which you're reporting. That's not obvious to me at all. I mean, you're saying our top ten clients represented back then. It sounds like during those years, our top ten clients at that time represented X percentage of the business. I can see it your way too, but I think it's... And there's an express warning that clients can leave the business and because we have a concentrated client base, which was expressly described, that there could be implications if large clients left the program. If there were no way under your theory for an investor to kind of back of the envelope, surmise that, oh, two of these clients who left must have been in their top ten, does that change your argument? Or are you relying upon the theory that someone could have pieced together using the information that was available to surmise that two of these clients were in the top ten? Your Honor, I don't think it depends on the ability of people to make that surmise. Because there isn't even... There's a percentage amount that's associated with the revenue generated by the top ten clients, but it is, again, it's not expressly stated who the existing top ten clients even are. There is one who's stated, Bank of Montreal, and you're very specific about their percentage of the overall revenue and the fact that their contract expires in 2023. So Sobeys was a smaller... Bank of Montreal was the largest client. Right. Sobeys was what number? Number two. Number two, right? I thought it was number two. Sobeys was number two for a period of time. There's not that much of a gap. I mean, maybe the percentages are different. At earlier points in time, Sobeys was number two. Sorry? You don't... You have to maybe just speak up just a little bit. In prior years, Sobeys had been number two. But when this was issued, Sobeys was still... Still one of the top ten clients. Right. In other words, you went to great lengths to say, for number one, it's a big deal, and there's a chance they could leave. And the insane thing about Sobeys, which was also a pretty big deal and had definitely done saber-rattling about leaving, they hadn't actually left, but you could see some similarities between the two. They had not actually left. They had decided to stay, and they had renegotiated their agreement, and it was certainly possible that they would do precisely the same thing the following year. In 2023 or 2023? Following the... After the spinoff in 2022. Right. So you're disclosing that a big client could leave in 2023. You had a big client here who could also leave in 2022, and you didn't disclose it, is my point. That's correct. That's correct. That was not expressly disclosed, but the actual terms of the agreement were not laid out in any detail, and there were references in the disclosures to contract terms that governed the end date of the contract. The actual disclosure, when it said Sobeys contract runs to 2024, it said, comma, subject to contract terms, which was an indication that there are contract terms that would bear on the end date of the contract. So to get back to Judge Lepar's question about the actual fact of the renegotiated agreement, you agree that that's a hard fact, right? That happened. There were terms that were negotiated. That's correct. Okay. So in prior 10Ks for ADS, there had been a disclosure that Sobeys contract ended in 2024. Why wasn't then it incumbent upon ADS to disclose that the new contract ended in 2023? Your Honor, I don't know why that particular detail had not specifically been provided. I'm not sure that it was as relevant, given the possibility of the early termination in 2022, to reiterate that point. The other plaintiffs point to, I think, at some point there's a reference to a, quote, And I think they would say, well, it's the opposite of stable to have one of the biggest clients renegotiate to cut the contract a year and take a 50% cut on the amount of fees they're being required to pay. So if we put the renegotiated contract up against the stable client-based statement, what's your response to that they needed to disclose the renegotiation? Your Honor, I don't believe they have to disclose that renegotiation. There is no, the original terms were not disclosed in full. There was an indication that they were subject to, the contract was subject to terms, and it was not essential for them to disclose that certain amendments had been made, including the termination year. There had been no disclosure in the prior years, 10K, of the termination date. That had dropped out. You have to go all the way back to the 1990, sorry, the 10K that came out in 2020 to actually see that reference to the date. That date comes out at that point and is not repeated. Any further questions? Thank you. If it may please the Court, I'm Peter Stokes for Defendants Horn and Chestnut. Judge Raebler, I'd like to go back to your opening question about the standard. And I think there are two legislative commands that bear on that point and that dispose of this case. Number one, there has to be a strong inference of fraudulent intent, a strong inference of Siena. As Congress dictated in the PSLRA passed after the 94 midterms, it's a clear legislative expression of intent. And the Sixth Circuit, this Court, has repeatedly said in the ServiceMaster case, the Miller case, the Kayak case, they use the word obvious. It has to be an obvious misstatement or an obvious duty to disclose to rise to that standard. How does the strong inference interact with 12B6 where we draw inferences, at least as things in the complaint, in favor of your friends on the other side? The Court has to weigh, the Court is duty-bound under tele-abs to weigh the inferences and determine whether a strong inference is present. The Court has to look at competing inferences, the overall specificity of the allegations, but also the clarity of the legal standards at issue and what the standard is for disclosure and whether it's a clear standard. Why isn't there enough from the fact that you're paying ADS $750 million or whatever and you have clients you know are on precarious ice? I mean, why, that combination, it seems to me, at least would allow the strong inference on a 12B6. Because the issue of Sienta is directed at whether the disclosures are misleading, not whether there's a motive, but whether the disclosures are misleading. The $750 million, that was publicly disclosed. The question is whether it is so obvious that they had a duty to disclose the Sobeys issue that it rises to the level of recklessness. And the SEC itself, in Item 1.02 to the 8K disclosure, they specifically say you only have to disclose the termination of a contract when it's actually terminated. And that gets to the second statutory command, which is that there has to be an affirmatively misleading statement. It's not enough to simply say that Sobeys was a potential problem, or even if it was a problem. There is no duty to disclose absent an affirmatively misleading statement that is in 10B5, that the PSLRA reflects that, and there was none of the cases the plaintiffs have cited. All the cases they've cited, Hellwig, every case they cite in terms of Highcrush, Hutchins, and Hedrick, they all involve some kind of affirmative misstatement that went beyond simply listing a logo or using the words long-term customers. They involve projecting revenue based on contracts that were going away or making affirmative statements. Here there were no statements at all affirmatively about the status of negotiations, about whether top ten sponsors had not renewed or not. There was quite a bit of discussion about Bank of Montreal. There was not a parallel discussion of Sobeys, and those were number one and number two. Correct. And there is absolutely no duty to disclose number two or number three or number four, let alone it. Is there a duty to disclose number one? I'm not sure if there is or not, Your Honor, but I think that goes to the lack of obviousness here. We don't think there's any duty at all to disclose, but it's clearly not an obvious duty that rises to that. You assume by disclosing one, you assume a duty to disclose others who are similarly situated, and Sobeys is almost worse, worsely situated. I respectfully submit, Your Honor, that that's just not required by law. That's not required by the case law of this court, and that's not required. There's no duty to disclose a magic number of clients. Well, what if you're affirmatively misleading? Like your friend on the other side in paragraph 108 of their complaint has the stable client base language in the presentation as you're spinning off with Sobeys featured pretty prominently, both in brand loyalty and, you know, in the number one loyalty program in Canada. So, I mean, why isn't that enough? Your Honor, as reflected on pages 32, 33 of our brief, that slide, the stable client base portion of that slide refers specifically to the other business. It refers to campaigns, which is the other business. It's not the Air Miles business. The other business was the campaign business. If you look at the color of the print that was used, it refers in the place in the slide where it's located, it refers to the other business. It was not a reference to Air Miles. And so, again, going back to the obviousness point that this court has emphasized on Sienner, there is not in anything approaching an obvious false statement, an obvious affirmative misstatement. So what do we do with the complaints? I get what you said in your brief, but they say in reality, as noted above, the company did not have a stable client base of top sponsors such as Sobeys that could be relied upon for generating recurring campaign demand. They make no specific allegations on the other part of the business that that statement was directed to. There's no allegation whatsoever about the other business, in this case, not being a stable client base. So that disclosure, Your Honor, it was not directed, as the slide reflects, towards the Air Miles business. And even if it were, Your Honor, it is still of the sort that this court has repeatedly characterized as, just like with long-term clients, it's not specific enough, not concrete enough. It's not measurable by objective standards to the extent necessary to be a material misstatement. And I think going back to the time... Your time is up. Do you have any more questions? Any more? Wrap it up. You've got two sentences. Sorry, Your Honor. I think Judge Buchwald in the HECSO case characterized the problem that you asked about. If we're going to require disclosures of interim twists and turns and negotiations, it's not good for investors. It's not good for businesses. And if the rule is going to change, it should be changed by Congress and the SEC.  We got your point. Thank you, counsel. Thank you, Your Honor. I think you have four minutes. Yes. This is yours. Go ahead. So first, defendants were making a point that the top ten sponsors could be calculated by revenue. But Defendant Horan's declaration says that air miles revenue and air miles issuance is a lagging indicator. Revenue comes in the future. So it's not true that you could calculate the top ten based on revenue. Your Honor has asked questions about the other top sponsors and the defendant's misleading nature of the statements. And I think what really exemplifies the point is in the 10-K filed actually, so it was by loyalty because now it's after the spinoff. They stated in the 10-K specifically that in terms of their ten largest clients represented 58 percent, 55 percent, and 46 percent of their revenue over the prior three years and that the loss of any of those clients could harm the business. I think that phraseology, grouping the largest customers together over three years and the loss of any of them, the only explanation or the reasonable explanation for an investor would be it's the same ten clients over that time period. And it wasn't. So that's misleading. Importantly, my friend on the other side were talking about Sienta. It's important that on Sienta a tie goes to the plaintiff. We don't have to say this is the only explanation for what happened, but enough that we raise a cogent and compelling inference of Sienta. Defendants raise the issue with the slide, the big slides. Again, we're here on a 12B6 and how it's going to be interpreted by a jury, they can make that argument how they want. What I see is a big slide, Sobey's logo all over the place, and Safeway, by the way, who is included in Sobey. So, and on that slide it says stable client base. I think it's a reasonable interpretation to say that they were saying Sobey's contributes to a stable client base. Can I ask you a question? Your friend on the other side, the second friend, you used the word obvious, say this has to be obviously misleading. Do you agree with that? I don't agree with that. First of all, there's recklessness is enough. Second of all, Obviousness is based upon the perception of the reader. Recklessness is based upon the mindset of the person making the statement. I'm not even sure I understand what the obvious point means. It was obvious to an observer. Something was misleading. It was obviously misleading. Anyway, I'm sorry, go ahead. If we look at it with hindsight, is it obvious to us it's misleading? Versus reckless being the mindset of the person making the statement. So, for the Sienter standard, it's the person making the statement, and if they were reckless at the time they made the statement, that is Sienter. Obviousness maybe goes more to falsity? Possibly, but I think it's also important to note that on falsity, the heightened inference standard under the PSLRA does not apply to falsity. It only applies to Sienter. So, the obviousness, I'm not sure how that even would balance in here. We believe that the district court ignored a lot of our allegations, and that we set forth a compelling and clear case for securities fraud. We ask that this court overturn. Thank you, counsel. The case will be submitted.